UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION



FILED
NOV 18 2005

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| MITAR ARAMBASIC, | * | CIV 03-4194 |
| Petitioner, | * | |
| | * | MEMORANDUM OPINION |
| vs. | * | AND ORDER DENYING |
| | * | PETITION FOR WRIT OF |
| JOHN ASHCROFT, Attorney General of the United States, and TOM RIDGE, Director of the Department of Homeland Security; and WARREN ANDERSON, U.S. Marshall's Service, | * | HABEAS CORPUS |
| Respondents. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## FACTUAL AND PROCEDURAL BACKGROUND

On February 24, 2003, a complaint was filed in the District of Minnesota, by the United States Attorney's office, on behalf of the Government of the Republic of Croatia, seeking extradition of Petitioner, Mitar Arambasic. Petitioner is a native of the former Yugoslavia and a citizen of Serbia-Montenegro. The extradition request was made pursuant to a 1902 treaty between the United States and Serbia.[1] The Request for Extradition alleged that Petitioner had been convicted, in absentia, "for the criminal act against humanity and international law, war crimes against civilians," and had been sentenced by a judgment dated May 21, 1997, to 20 years of imprisonment. According to the Request for Extradition, the 1997 judgment of conviction was based on conduct Petitioner was alleged to have engaged in as "a commander in the so called 'SAO Krajiona police unit- Martic´, police Otisic´" with co-perpetrators in the period from 11th March 1991 to 4th August 1995, [while]

---

[1] Attached to the Complaint seeking extradition is the declaration of Kenneth Propp, an Attorney Adviser in the Office of the Legal Adviser for the Department of State. Mr. Propp declared that the Extradition Treaty between the United States and Serbia on May 17, 1902, was in force with the former Yugoslavia, and since the dissolution of Yugoslavia, the 1902 treaty has applied to Croatia as a successor state. Mr. Propp further declared that the offenses for which extradition of Petitioner was sought are covered by Article 2 of the 1902 treaty.

they were members of the so called 'border police units', in other words 'members of the Republika Srpska army' and took active part in the armed clashes against the Croatian police and Croatian Army unites." The extradition case was transferred from the District of Minnesota to the District of South Dakota based on the Petitioner's request and over the Government's objection. This Court has made the file in the extradition case, CR. 03-M10, part of the file in this case.

On April 30, 2003, an extradition hearing was held before Magistrate Judge John Simko. The written Sentence and Judgment document pertaining to Petitioner and thirty-eight others who were accused of similar crimes was provided by the Croatian government, in support of its request for Petitioner's extradition. The Sentence and Judgment document is 124-pages long, and has been translated into English. This document refers to Petitioner as the commander of the Martic's militia, and concludes that Petitioner participated in occupying the villages along the right bank of Peruca Lake, and that Petitioner stood out in torching and pillaging these villages. In the Judgment and Sentence, Petitioner is also found guilty of torturing, disfiguring and killing imprisoned Croatian police officers. The Croatian charges for which Petitioner was found guilty were brought under statutes proscribing "Criminal Acts Against Civil Population" and "War Crimes Against Prisoners of War."

On July 8, 2003, Magistrate Judge Simko, pursuant to 18 U.S.C. § 3184, issued Findings of Fact and Conclusions of Law and Certification to the Secretary of State that Petitioner was extraditable to Croatia on the charges for which extradition was sought, that there was no defense to extradition available to Petitioner, and that the grounds asserted by Petitioner did not justify denial of extradition. Petitioner appealed directly to the United States Court of Appeals for the Eighth Circuit, and the Eighth Circuit granted the Government's motion for dismissal of the appeal.[2]

---

[2] Neither the accused nor the Government may appeal from the initial decision of extraditability. *See United States v. Wiebe*, 733 F.2d 549, 552 (8th Cir. 1984); *See also* Restatement (Third) of the Foreign Relations Law of the United States § 478 cmt. c (1987).

Petitioner has filed his Petition for Writ of Habeas Corpus, and two amended petitions in this action. Doc. 1, 16, and 22. In his first amended petition for writ of habeas corpus, Petitioner contends: 1) That the United States has no treaty with the Republic of Croatia; 2) That even if a treaty of extradition exists between the two nations, Petitioner is not extraditable under the Political Offense Exception; and 3) That even if the Political Offense Exception does not apply, Petitioner should not be extradited because of Croatia's atrocious human rights record towards its Serbian minority, of which Petitioner is a member.[3]

Arambasic has filed three pro se motions to correct errors in the record in this case. Doc. 29, 33 and 41. After the first motion to correct errors was filed, this Court issued an order directing counsel for Arambasic to submit an amended motion specifying the alleged errors in issue and the legal basis to correct the same, or advise the Court that the record need not be corrected. Doc. 30. Counsel then moved to withdraw as counsel (Doc. 35), then withdrew the motion to withdraw as counsel (Doc. 36). Counsel for Arambasic has been in contact with Court staff regarding his efforts to communicate with his client on the matter of correction of the record. On May 27, 2005, counsel filed a verification stating that to the best of their knowledge, the facts alleged in support of the claims of this case are true and correct. Doc. 37.

## SCOPE OF REVIEW

The Eighth Circuit has opined that a writ of habeas corpus may not double as a writ of error. Furthermore, questions that involve the weight and sufficiency of the evidence received at an extradition hearing are normally not reviewable in habeas corpus proceedings. *See United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984). The Supreme Court has explained:

> [The petition for writ of habeas corpus] is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate has jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension,

---

[3] In the second amended petition, Petitioner adds Warren Anderson as a Plaintiff and seeks relief against the Government for default. This Court previously denied default relief in its September 30, 2004, Order. Doc. 26.

whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*Fernandez v. Phillips*, 268 U.S. 311,312 (1925), *quoted in United States v. Wiebe,* 733 F.2d at 552.

## I.
## WHETHER THE TREATY OF EXTRADITION BETWEEN THE UNITED STATES AND SERBIA CONSTITUTES A LEGAL BASIS UPON WHICH EXTRADITION OF PETITIONER MAY BE REQUESTED?

The extradition request in this case was made pursuant to a treaty between the United States and Serbia which was signed in 1901 and ratified in 1902. At that time there was no independent nation of Croatia. At that time, Croatia was a part of the Austro-Hungarian Empire. After World War I, both the Kingdom of Serbia and the Austro-Hungarian Empire ceased to exist as independent political entities. In 1929, the Kingdom of Serbs, Croats and Slovenes became Yugoslavia. Yugoslavia, after World War II, became the Federal Socialist Republic Yugoslavia, and united Croatia and several other states under the communistic leadership of Marshall Tito. At the end of the 1980's, Yugoslavia began to fall apart with the collapse of Communism in Eastern Europe. Croatia declared its independence in 1991, and civil war erupted between Serbs and Croats. In December of 1995, Croatia signed the Dayton peace agreement and committed itself to a permanent cease-fire and the return of all refugees.

Petitioner contends that the question of whether or not a treaty of extradition exists is a question of law, not a political question. Petitioner further contends that the United States has no treaty of extradition with the Republic of Croatia, and that this Court should conclude that there is no legal basis for his extradition in the absence of such a treaty.

The doctrine of state succession, by which a successor state is bound by the treaty obligations undertaken by the prior state, is applicable to the case at hand. State succession has been consistently recognized and practiced with regard to extradition treaties. *See, e.g., Sabatier v. Dabrowski,* 586 F.2d 866 (1st Cir. 1978)(Canada deemed successor to Webster-Ashburton treaty with England);

4

*Ivancevic v. Artukovic*, 211 F.2d 565 (9th Cir. 1954)(Yugoslavia deemed successor to treaty with the Kingdom of Serbia). The trend is to favor the presumption of state succession unless the successor state explicitly rejects a given treaty. *See generally*, M.Basiouni, International Extradition: United States Law and Practice, Ch. II, § 5.4.2 (4th Ed. 2002). Petitioner has presented no evidence that the Republic of Croatia has rejected the treaty between the United States and Croatia. In fact, the request for extradition, which was submitted by the Minister of Justice of the Republic of Croatia, bases the request on the October 12, 1902, Convention on Extradition which produced the Extradition Treaty between the United States and Serbia.

In addition, Article II, § 2 of the Constitution confers the treaty-making power to the President with the advice and consent of the Senate. Accordingly, this Court will give substantial weight to the determination of the political departments of the Government on the issue of whether a treaty is still in effect. *See Ivancevic v. Artukovic*, 211 F.2d 565, 574 (9th Cir. 1954). Kenneth Propp, an Attorney Adviser in the Office of the Legal Adviser for the Department of State, stated in a Declaration which was attached to the extradition complaint, that the Extradition Treaty between the United States and Serbia on May 17, 1902, was in force with the former Yugoslavia, and since the dissolution of Yugoslavia, the 1902 treaty has applied to Croatia as a successor state. Based on these considerations, the Court rejects Petitioner's contention that there is no treaty upon which he can be extradited.

## II.
## WHETHER PETITIONER'S EXTRADITION IS PRECLUDED BY THE POLITICAL OFFENSE EXCEPTION?

Article VI of the Extradition Treaty between the United States and Serbia provides:

> A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character.

> No person surrendered by either of the high contracting parties to the other shall be triable or tried, or be punished, for any political crime or offense, of for any act connected therewith, committed previously to his extradition.

> If any questions shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the Government on which the demand for surrender is made, or which may have granted the extradition, shall be final.

The Government contends that the third paragraph of Article VI dictates that the determination of whether the crimes for which extradition is sought are political offenses should be committed to the executive branch rather than the judiciary. However, it has been recognized for well over a century that the courts shall determine whether a particular offense comes within the political offense exception.[4] While the language in this particular treaty may be slightly different than that used in other treaties, the Government has offered no reason "why courts should determine political offense questions under some treaties, but not under others." *See Matter of Extradition of Mackin*, 668 F.2d 122, 133 (2nd Cir.1981). Magistrate Judge Simko, in his findings of fact, conclusions of law and extradition certification, concluded that it did not appear any court in the nation had adopted the interpretation of paragraph three of Article VI promoted by the Government.[5] The Government has not offered any case law to refute this conclusion. Having concluded that it was appropriate for the Magistrate to have determined the political offense exception, this Court will review the Magistrate's application of the political offense exception in this case.

Unlike other issues presented in a habeas corpus action regarding extradition, the political offense exception presents a mixed question of law and fact. *Ornelas v. Ruiz* 161 U.S. 502, 509 (1896). A Magistrate's purely factual findings underlying the application of the political offense exception must be reviewed under the clearly erroneous standard. The mixed question of fact and law, however, such as whether the alleged crime was incidental to a political uprising, and questions

---

[4] It is, however, within the Secretary of State's discretion to determine whether a country's request for extradition is a subterfuge to try to punish the fugitive for a political offense. *See In re Lincoln*, 228 F. 70 (E.D.N.Y. 1915), *aff'd per curiam*, 241 U.S. 651 (1916).

[5] *See also, Eain v. Wilkes*, 641 F.2d 504, 513 (7th Cir. 1981)("We have not found any case where an American court declined to consider the applicability of the political offense exception when it was squarely presented.")

solely of law must be reviewed *de novo*. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986); *Ahmad v. Wigen*, 726 F.Supp. 389, 408 (E.D.N.Y. 1989).

A purely political offense involves conduct directed against the sovereign or its political subdivisions but does not have any of the elements of a common crime. Treason, sedition and espionage are examples of purely political offenses. A relative political offense involves a crime prompted by ideological motives. It involves a private wrong directed against person or property, but committed in furtherance of a political purpose. M. Bassiouni, International Extradition: United States Law and Practice, Ch. VIII, §§ 2.1.4 - 2.1.5. Petitioner contends that the crimes for which Croatia seeks extradition are relative political offenses subject to protection under Article VI of the Extradition Treaty.

Although the political offense exception is a standard clause in almost all extradition treaties of the world, the term "political offense" is seldom defined in the treaties or national legislation. Judicial interpretations, therefore, have been the principal source for the meaning and application. *See generally,* M. Bassiouni, International Extradition: United States Law and Practice, Ch. VIII, §2.1.1 (4th Ed. 2002).

In *Ornelas v. Ruiz* 161 U.S. 502 (1896), the United States Supreme Court first examined the political offense exception in a case in which Mexico sought the extradition of Mexican citizens, for murder, arson, robbery, and kidnaping. In 1892, the petitioners, allegedly, as part of a band of armed men passed over the Rio Grande from Texas into Mexico, and attacked about 40 Mexican soldiers, killing some of the soldiers, wounding others and capturing yet other soldiers. The men allegedly burned the soldiers' barracks, and stole their horses and equipment. The men also were accused of violently assaulting private citizens, stealing their horses and other property, burning their homes, extorting money from women, and kidnaping three citizens. Although the district judge ordered the petitioners released after concluding the raid was part of "a political movement, having for its purpose the overthrow of the existing government in Mexico," the evidence before the commissioner was that "these men were bandits without uniforms or flag, but with a red band on their hats." *Id.*

at 510. Petitioners presented evidence that in the previous year there had been a revolutionary movement on the border in issue under a leader named Garza. Garza, however, was neither present for nor involved in the incident in 1892.

The extradition treaty with Mexico provided that the "present treaty shall not be applied in any manner to any crime or offense of a purely political character." Although the treaty referred to offenses which were of a "purely political character," the Supreme Court applied an analysis which is applicable to relative political offenses. The Court referred to the "character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed" as support for the commissioner's holding that the crimes in issue were not a "movement in aid of a political revolt, an insurrection, or a civil war." *Id.* at 511.

*Eain v. Wilkes*, 641 F.2d 504, 61 A.L.R. Fed 757 (7th Cir. 1981), is a major modern-day case in which the Seventh Circuit examined the political exception in an extradition case. In *Eain v. Wilkes*, the court examined an extradition treaty which, like the case at hand, contained the traditional extradition treaty language excepting from the treaty crimes that are "of a political character." 641 F.2d at 516. The Seventh Circuit acknowledged that for an act to constitute a political offense excepted from extradition under such a treaty, two basic determinations must be made: 1) There was a violent political disturbance in the requesting country during the time the alleged acts occurred; and 2) The acts charged against the person whose extradition is sought were recognizably incidental to the political disturbance. *Id.*; *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir. 1971). Whether or not an offense is a political offense is to be determined by the circumstances attending the alleged crime, and not by the motives of those who subsequently are in charge of the prosecution. *Garcia-Guillern v. United States*, 450 F.2d at 1192.

"Political disturbance," in the context of the political offense exception, is defined with its focus on organized forms of aggression such as war, rebellion and revolution. In this context, the definition of political disturbance is "aimed at acts that disrupt the political structure of a State, and not the social structure that established the government." *Eain v. Wilkes*, 641 F.2d at 520-521.

In an extradition case, the defendant bears the burden of proof to establish the essential elements of the political offense exception. Once a defendant has established the essential elements of the political offense exception, the burden shifts to the demanding government to prove the crimes charged in the complaint were not of a political character. *See United States v. Pitawanakwat*, 120 F.Supp.2d 921, 928 (D. Ore. 2000). *Ramos v. Diaz*, 179 F.Supp. 459, 463 (S.D. Fla. 1959).

The extradition record supports a determination that there was a violent political disturbance during the time the alleged acts occurred. Page 74 of the 124-page Sentence and Judgment document contains the following historical summary:

> In order to enable a historic understanding of the event, it is to be stated that it is unchallenged by the parties to the trial that there was a partial occupation of the Croatian national territory, the area of the Municipality of Sinj, from August of 1991 through August of 1995. The occupation was performed by joint forces of the former Yugoslav National Army (JNA), the so-called "Martic's militia" and the so-called "SAO Krajina Territorial Defence." The said "territorial defence" units were established at the JNA's initiative, for particular villages, and under direct army command. Such joint forces attacked and occupied villages along the right and the left banks of the Peruca Lake.

In addition, this Court may properly take judicial notice of a political disturbance in an extradition case. See, e.g., *Ramos v. Diaz*, 179 F.Supp. at 462 (extradition court took judicial notice of revolutionary movement in Cuba). After Croatia declared its independence in 1991, a civil war erupted between the Serbs and Croats. Not until December of 1995, did Croatia sign the Dayton peace agreement and commit to a permanent cease-fire. This civil war was waged by indigenous people within the territory in which they resided. Furthermore, the civil war involved conduct designed to disrupt the political structure of the State. Arambasic, a Serb, was a commander of the Martic's militia during this civil war. Magistrate Judge Simko made no explicit findings and conclusions with regard to the "political disturbance" element of the political offense exception, but rejected the political offense exception in this case based on the circumstances and status of those persons alleged to have been harmed by Arambasic. This Court concludes that Arambasic has met his burden of establishing the "political disturbance" element of the political offense exception.

This Court must then determine whether the acts charged against Arambasic were recognizably incidental to the political disturbance. Neither Magistrate Judge Simko in his findings and conclusions, nor the Government, have disputed that the acts charged against Arambasic were recognizably incidental to the civil war that was occurring at the time frame is issue. In the Government's supplemental response to the second amended petition for writ of habeas corpus, the Government states, "Assuming that the crimes charged are 'incidental to' a 'severe political disturbance' within the territory that is not the Republic of Croatia, Arambasic's crimes were directed against civilians and prisoners, and thus are not protected by the political offense exception." The Government further contends that most courts agree that a "self-declared insurgent" may not rely on the political offense exception when his crime is directed at innocent civilians and not at the government against which he is rebelling. Government's Supplemental Answer to Petition for Writ of Habeas Corpus, p.11 (Doc. 23)

The title of "self-declared insurgent" does not accurately describe Arambasic. The request for extradition, included in Government's Exhibit 1, in CR. 03-M10, states that Arambasic was convicted for "taking part as a commander in the so called 'SAO Krajina police unit- Martic police Otisic' with co-perpetrators in the period from 11th March 1991 to 4th August 1995, they were members of the so called 'border police units', in other words 'members of the Republika Srpska army' and took active part in the armed clashes against the Croatian police and Croatian Army unites." This Court concludes that Arambasic's position as a policeman or Army unit member was recognizably incidental to the political disturbance which was taking place in what is now the Republic of Croatia between 1991 and 1995. The fact that an alleged perpetrator is in an organized military or para-military unit during a political disturbance does not mean that every act then committed by that person is covered by the political offense exception.

The resolution of the applicability of the political offense exception thus depends on whether the demanding government has proven that the crimes charged in the complaint were not of a political character and whether the fact that the complaint alleged acts against civilians and policemen who had allegedly surrendered precludes the political offense exception.

In *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986), the Ninth Circuit Court of Appeals examined the history and purpose of the political offense exception, and concluded that an impartial judiciary, in applying the political offense exception, should apply the exception in a neutral fashion which would focus on the political objectives, not the tactics of those persons invoking the exception. In urging this Court to reject the reasoning of *Quinn v. Robinson* the Government contends that even "even the Ninth Circuit has questioned whether Quinn is binding authority on [the political offense exception], repeatedly characterizing Quinn's discussion instead as dicta." Government's Supplemental Answer, p. 12 (Doc. 23)(citing *McMullen v. INS*, 788 F.2d 591, 596-597 (9th Cir. 1986)).

Recently, in *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005), the Ninth Circuit in an *en banc* decision reexamined the analysis and holding in *Quinn v. Robinson*. In the *Barapind v. Enomoto* case, the Government of India had requested extradition of Barapind, a native and citizen of India, charged with various murders, attempted murders, and robberies. Barapind was a prominent leader of the All India Sikh Student Federation, which was dedicated to establishing an independent sovereign Sikh nation. The extradition court denied certification of extraditability for eight of the eleven separate incidents which were the basis of the crimes for which India sought extradition after concluding either that India failed to show probable cause to suspect Barapind of the crimes, or because the crimes were covered by the political offense exception in the treaty between the United States and India.

The Ninth Circuit reversed in part and remanded the *Barapind v. Enomoto* case to determine whether the murder of four victims during a shoot out between insurgents and agents or former agents of the Indian Government were political offenses and non-extraditable. The Ninth Circuit concluded that the extradition court had operated under a mistaken understanding of what constituted circuit law when it found that it was not bound by *Quinn v. Robinson*'s analysis which established that extradition courts should focus not on the types of acts alleged, but rather on the motivation for the acts in determining whether the political offense exception applies in an extradition case. *Barapind v. Enomoto*, 400 F.3d at 750. In ruling that *Quinn v. Robinson*'s analysis of the political

11

offense exception was binding law in the Ninth Circuit, the Ninth Circuit overruled *McMullen v. INS*, 788 F.2d 591 (9th Cir. 1986), the immigration case cited to by the Government in this case. There is no controlling Eighth Circuit law and this Court declines to apply the *Quinn v. Robinson* analysis. Instead, this Court is applying the precedents of the Seventh Circuit in *Eain v. Wilkes*, supra, and the Second Circuit in *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990).

This Court concludes that the traditional two-part American test serves the purposes and objectives of the political offense exception. As previously stated, this test requires a determination of whether there was a violent political disturbance in the requesting country during the time the alleged acts occurred, and whether the acts charged against the person whose extradition is sought were recognizably incidental to the political disturbance. Further, this Court concludes that an ideologically neutral application of the test is consistent with the ideologically neutral text of the treaty provision in the case at hand. The goal of changing a government by indigenous people within the territory in which they resided is present in the case at hand. One commentator has observed: "Much reporting of the events in Yugoslavia ... falls into the 'senseless and violence' school of journalism. In fact, most of the events during the fighting represented logical (if violent and brutal) steps toward coherent goals." Sowards, Steven W., "Twenty-five Lectures on Modern Balkan History (The Balkans in the Age of Nationalism) - Lecture 25: The Yugoslav Civil War," *available at* http://www.lib.msu.edu/sowards/balkan/. The Croats in Croatia had coherent goals in setting up and maintaining new forms of political power. Likewise, the Serbs in Croatia had coherent goals in resisting the establishment of the new political power. One of the Serbian affiants in this case set forth his perception of the situation as follows: "Civil war broke out in Croatia in 19991 due to Croatian government dismissal of Serbs from employment in government owned enterprises that employed almost the entire work force at that time. Serbian population in Croatia was faced with starvation or resettlement in other countries." Doc. 53, Defendant's Ex. C in CR. 03-M10. This Court should not and will not make a qualitative judgment about the political objectives of the competing forces involved in Croatia during the relevant times.

After having concluded that Arambasic has met his burden of proof in establishing the essential elements of the political offense exception, and having further declined to place additional limitations on the test for meeting the political offense exception, this Court must determine whether the demanding government has proven that the crimes charged in the complaint were not of a political character. The Croatian Government provided a124-page document entitled "Sentence," and translated into English, which is a summary of the charges, trial, results of the trial and sentences imposed against Arambasic and thirty-eight others, who are all identified therein as Serbs and as members and officers of military units. Most of the thirty-nine defendants were tried *in absentia*. Various parts of the 124-page document refer specifically to Mitar Arambasic in detail.

> Page 18 of the 124-page document states that Mitar Arambasic and ten other defendants:
>
> near the Raba bridge in Maljkovo, in the presence of and as ordered by the 1st accused Rajko Radulllovic, beat with rifle butts, feet and fists the imprisoned police officers Ivica Grubac and Bogoslav Lukic who laid their weapons down, creating thereby the atmosphere of lynch, beating terribly the above named police officers by rifle butts all over their bodies, of which hits they were falling to the ground, begging for their lives, but in spite of this the attackers continued beating them and stepping on their heads and other parts of the bodies, causing that way the prisoners terrible suffering for over an hour, after which each of them fired a machine-gun burst into their totally exhausted and tortured bodies, followed by disfiguring their bodies by cutting and smashing heads and limbs, which injuries caused deaths of Ivica Grubac and Bogoslav Lukic.
>
> Page 18 of the 124-page document states that Mitar Arambasic and two other defendants:
>
> having imprisoned in combat in Potravlje Kazimir Abramovic, police officer of Special Police Unit of the Croatia's Ministry of Interior, and after he laid his arms down, fired into him several bullets from unidentified weapons, causing thereby numerous bullet and explosive wounds of the back that soon caused his death.
>
> Page 65 of the 124-page document contradicts, to some degree, the above summaries, and provides:
>
> Particularly asked what he knows about some particular cases of killing of civilians, [Marco Rnic] said that he had heard that two Croatian policemen had been imprisoned in the actions of taking Maljkovo and Potravlje and that "Hari" shot them from the back. He heard that directly from Radovan Rnic.

13

Page 108 of the 124-page document contains the following conclusions regarding Mitar Arambasic:

> The 19th accused, Mitar Arambasic, was commander of the Martic's militia, Milan Martic's volunteer, and is the brother of Milan "Hari" Arambasic. He was among the first at the barricades erected after establishing the Martic's militia on the Vrnka-Sinj road, aimed to terrorising the local population by cutting communications and movements of people and vehicles. He participated in occupying the villages along the right bank of Peruca Lake, and stood out in torching and pillaging in Maljkovo, Potravlje and Bitelic.
>
> About his standing out in pillage talk the accused Marko Rnic, Slobodan Despinic and Jovan Bilic, and the witness Milan Stojsavljevic, who said that Mitar Arambasic was a "mere war vulture" how had a lorry and who was selling the stolen goods in Batajnica, Serbia. The accused Mitar Arambasic was among those who first shot the imprisoned policemen, Grubac and Lukic, in Maljkovo, and also participated, jointly with his brother Milan "Hari" Arambasic in killing of the imprisoned Kazimir Abramovic near the "Kenedi" Inn. He is said to have killed some civilians in Cvitkovic by driving them into a cellar and killing them there by an axe. The witness Marko Cvitkovic, brother of the late Blaz Cvitkovic, said in the trial that Iva Cvitkovic, his sister-in-law, and their daughter Mara were killed by Mitar Arambasic. He learned that from Gojko Arambasic, who he saw in the Sinj hospital. The accused Slobodan Despinic too confirmed that there were talks that Milan Stojsavljevic said that Mitar Arambasic had played cards with the "white eagles" in who would liquidate five civilians at Paljike. He also said that Mitar Arambasic participated in events in Zasiok, and stood out in torching Croatian houses in Zasiok and Dabar. Marco Rnic, too, says that Mitar Arambasic took part in torching houses in Maljkovo, Potravlje and Bitelic, as well as in Vucipolje, Dabar and Zasiok, here he participated the cleansing action.
>
> The Court holds that the above described acting of Mitar Arambasic constitute the criminal offense described in section 120, sub. 1, and section 122 of the OKZ RH.

At the extradition hearing, Judge Simko received affidavits submitted on behalf of Arambasic regarding the use of torture to obtain evidence against the defendants at the trial in May of 1997 in the Circuit Court of Split. Slobodan Despinic, who incriminated Arambasic at trial, submitted a 5-page affidavit detailing the beatings and torture he allegedly suffered after surrendering to the Croatian Army on August 5, 1995. Defendant's Ex. B. Despinic contends he was forced to sign written statements against other Serbs and was forced to repeat those statements in the Circuit Court of Split. In his affidavit, Despinic contends that he did not see and he does not know who

14

participated in the killing of the two captured Croatian policemen on September 16, 1991, and that he incriminated Arambasic and the others after being tortured with electricity. Despinic also contends that he does not know how a Croatian soldier Abramovic was killed on September 17, 1991, as his company was not close to the area of military actions where Abramovic was killed. Despinic denied the truth of other allegations he was reported to have made against Arambasic. Despinic stated in his affidavit that Milan Stojsavljevic testified at the trial in May of 1997 in the Circuit Court of Split but did not incriminate Arambasic.

Marco Rnic, a former member of the Yugoslav military, also incriminated Arambasic at trial. Marco Rnic stated in his affidavit that if he implicated Arambasic he did so falsely and to avoid more torture from his interrogators. Defendant's Ex. D.

> In his affidavit, (Defendant's Ex. E) DeGojko Arambasic stated the following:
>
> While I was detained at Sinj, I remember one occasion that a civilian man was permitted by Croatian police to come in and interrogate me. He represented himself as Cvitkovic and I do not recall his first name, but he said his brother, sister in law and niece were missing. His relatives lived in Potravlje, which is a village next to Otisic. He heard rumors that Mitar Arambasic killed them. He learned that an Arambasic man is in that camp and wanted to question me.
>
> I told him that I never heard that any women were killed in Potravlje and if that happened I would have heard it.   ... I said that it would not be fair to accuse anybody because it may be possible that his family members are refugees and that they could be later found. I asked Mr. Civkovic who did he hear that rumor from, but he refused to tell me his source.

At the extradition hearing, Arambasic called as witnesses two former Serbian prisoners who had spoken to Slobodan Despinic while they were in jail. Both testified as to the use of torture to obtain statements, and both testified as to the torture alleged by Slobodan Despinic during the time he gave statements against Arambasic and others. Extradition hearing transcript pp. 50-82. Recantations are troubling but they are viewed with caution by the courts and do not defeat extradition in this case.

Also, the fact that Arambasic was convicted *in absentia* does not alone warrant a denial of extradition. *See*, M.Basiouni, International Extradition:United States Law and Practice, Ch. VIII, §4.8. However, where a conviction is the result of a trial *in absentia*, the conviction is regarded merely as a charge, requiring independent proof of probable cause. *In re Ribaudo*, 2004 WL 213021 (S.D.N.Y.)(not reported in F.Supp.2d); *In re Ernst*, 1998 WL 395267 (S.D.N.Y.)(not reported in F.Supp.2d); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960).

In *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005), the Ninth Circuit *en banc* reaffirmed *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986). At page 750 the *Barapind* court observed: "In *Quinn,* we discussed the 'incident to' analysis in depth, stating that extradition courts should focus not on the type of acts alleged, but rather on the motivation for those acts." As previously indicated, this Court declines to apply that test. For example, that test ignores whether the victims were unarmed civilians or whether they were armed combatants. The Seventh Circuit, in *Eain v Wilkes*, 641 F.2d 504 (7th Cir. 1981), recognized that the civilian status of victims is of significance as did the Second Circuit in *Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990). Given the many variations of criminal activity and of political acts, no one test seems possible for what is subject to the political offense exception. Instead, the statement of the Supreme Court's *Ornelas v. Ruiz* position as stated in the minority opinion in *Barapind* at 753 should be followed:

> I believe we should overrule *Quinn*'s elaboration of the 'incidental to' prong and instead follow the approach articulated by the Supreme Court in *Ornelas v. Ruiz*, 161 U.S. 502, 511, 16 S. Ct. 689. 40 L.Ed. 787 (1896), by Considering the "character of the foray, the mode of attacks, the persons killed or captured, and the kind of property taken or destroyed."

The Republic of Croatia has provided sufficient independent proof of probable cause. This Court also concludes after examining all of the evidence that the Republic of Croatia has adequately shown that the crimes charged in the complaint were not of a political character.

Under the facts of this case, attacks by military units on other combatants would be acts of a political character. This would be true without regard to whether the opposing combatants were in a regular military unit or were armed guerrillas. Here the evidence shows that the alleged victims

were policemen who were unarmed and had surrendered while others were unarmed civilians. The atrocities allegedly committed upon these unarmed people were not in the furtherance of a political cause. Political strife is not a license for the military or anyone else to do whatever they wish to the defenseless that have come under their power. Mr. Arambasic should have the basic right to stand trial before a neutral tribunal where he has a fair opportunity to defend against the charges made.[6] Habeas corpus relief will for the reasons stated be denied on the basis of Article VI of the Extradition Treaty between the United States and Serbia. Accordingly,

IT IS ORDERED that Petitioner's Second Amended Petition for Writ of Habeas Corpus (Doc. 22) is denied.

Dated this 18th day of November, 2005.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: Shelly Margulies
(SEAL)   DEPUTY

---

[6]This is not the proceedings in which to consider whether extradition should be declined because of Croatia's human rights record towards its Serbian minority. The Court notes, however, that *Cornejo-Barreto v. Siefert*, 379 F.3d 1075 (9th Cir. 2004), the case relied upon by the Government in resisting the habeas corpus petition under the Rule of Non-Inquiry, has been vacated by the Ninth Circuit. *See Cornejo-Barreto v. Siefert* 389 F.3d 1307 (9th 2004)(vacating 379 F.3d 1075, but denying Government's request to vacate other published opinions in the case). *Cornejo-Barreto v. Siefert*, 218 F.3d 1004 (9th Cir. 2000) was not vacated. That decision held that under the Administrative Procedure Act there was judicial review available of the Secretary of State's decision regarding the Torture Convention. Even if such review is available in the Eighth Circuit, there would be no basis to request review unless and until the Secretary of State denied petitioner relief.